## COMMONWEALTH *VS.* JACK BELIARD.

Suffolk. November 5, 2004. - December 17, 2004.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Search and Seizure,* Affidavit, Warrant. *Constitutional Law,* Search and seizure, Assistance of counsel. *Practice, Criminal,* Argument by prosecutor, Assistance of counsel, Capital case.

In a criminal case, the Superior Court judge properly denied a pretrial motion to suppress evidence found in the defendant's home after a search pursuant to a warrant, where the defendant failed to demonstrate that the supporting affidavit was legally insufficient either on the ground that it did not establish the veracity and reliability of one of the informants, or on the ground that the information contained in the affidavit was stale. [84-86]

At a murder trial, the prosecutor's remarks in her opening statement regarding the murder weapon had an evidentiary basis and were not improper. [86]

A criminal defendant failed to demonstrate that his trial counsel rendered ineffective assistance when he waived a hearsay objection to the admission of evidence of guilty pleas in another case to which the defendant was not a party, where the decision not to object was, in the circumstances, a tactical strategy that was not manifestly unreasonable [86-89]; further, the defendant failed to demonstrate that counsel rendered ineffective assistance in eliciting certain incriminating hearsay testimony without seeking a limiting instruction on its use, where the incriminating part of the hearsay statement was cumulative of other testimony [89-90].

A Superior Court judge, in denying a criminal defendant's motion for a new trial challenging the admission of certain forensic evidence under *Commonwealth* v. *Lanigan,* 419 Mass. 15 (1994), properly examined the issue in the context of the law governing the defendant's obligations in filing a postconviction motion for a new trial, and correctly concluded that there had been sufficient acceptance of such evidence by forensic experts. [90-91]

INDICTMENT found and returned in the Superior Court Department on February 12, 1997.

A pretrial motion to suppress evidence was heard by *Thomas E. Connolly,* J.; the case was tried before *Robert W. Banks,* J.; and a motion for a new trial, filed on January 21, 2003, was heard by *Nonnie S. Burnes,* J.

*David Duncan* for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. Based on a shooting that occurred in the early morning hours of September 7, 1996, in the Mattapan section of Boston, a jury convicted the defendant of murder in the first degree (as a joint venturer) on the theories of deliberate premeditation and extreme atrocity or cruelty; unlawful possession of a firearm; and unlawful possession of ammunition. The jury acquitted the defendant of a second charge of unlawful possession of ammunition that was based on his alleged possession, after the murder, of a single round of ammunition seized pursuant to the search warrant he challenges in this appeal. The defendant was tried with Luidgi Denis, who was acquitted by the jury of all charges.[1] A judge, who was not the trial judge, denied the defendant's motion for a new trial which claimed that his trial counsel was ineffective in failing to challenge the admission of the Commonwealth's ballistics evidence concerning "bunter tool marks" made on discharged cartridge casings.[2] Represented by new counsel on appeal, the defendant argues: (1) his motion to suppress evidence seized from his residence should have been allowed; (2) error in the prosecutor's opening statement; (3) error in the admission in evidence of the guilty pleas of one of his brothers to an earlier armed home invasion and shooting; (4) that his trial counsel furnished him with constitutionally ineffective representation by eliciting an incriminating statement from a witness; and (5) his motion for a new trial was improperly denied. We affirm the defendant's convictions and discern no basis to exercise our authority under G. L. c. 278, § 33E.

The jury could have found the following. On September 3, 1996, the defendant's brother, who was known as Bobby Be-

[1] The codefendant, Luidgi Denis, was charged with murder in the first degree, unlawful possession of a firearm, and unlawful possession of ammunition.

[2] As we shall explain in more detail later in this opinion, bunter tool marks are distinctive marks made by the manufacturers of bullets that allow a ballistics expert to identify discharged cartridge casings as having been made by a particular manufacturer's bunter tool.

liard (Bobby),[3] asked Serge St. Fort, who was working at a pizza shop in Mattapan, to "hold onto" his bicycle for a while. When Bobby had not returned by the end of St. Fort's shift, St. Fort passed the bicycle on to Alexis Paul with instructions to return it to Bobby. Paul gave the bicycle to the victim, Rico Green, who sold it and refused to reimburse Bobby.

Upset over the theft, the defendant stated that he wanted a confrontation, and that Rico's "gonna have to pay for it." The defendant considered whether to engage in a fight with the victim and his friends, or whether to "take them off the block" by shooting them. On the evening of September 4, a fight over the bicycle took place between the defendant and some of his friends, and the victim and his friends. During the fight, the defendant was struck (not by the victim, but by one of his friends) and suffered a black eye.

Following the fight, the defendant told St. Fort, "We have a plan," and "We gonna go after these guys tonight." The defendant also stated that he wanted to retaliate and shoot somebody. The defendant made telephone calls in an attempt to obtain a gun or guns and ammunition.

Somewhere after 3 A.M., on September 7, 1996, two men approached the victim while he was out walking his dog and repeatedly shot him. The men ran away. The victim died as the result of multiple gunshot wounds, three to his head, one to his chest, one to his upper back, and four to his upper and lower extremities. The gunshot to his chest would have severely impaired his breathing.

Later in the morning of September 7, Paul, who was a friend of both the victim and the defendant and codefendant, visited the defendant. In the basement of the defendant's house, Paul observed a "sawed off shotgun," "a nine millimeter and a .25 caliber," and "a box of shells for each gun on the floor." The defendant told Paul that he shot the victim three times in the head. The defendant stated that "they" were after "the kid on the bike first," but he had left by the time they approached him. The next person they saw was the victim.

On another occasion in the defendant's basement, the

---

[3]Bobby Beliard's first name is Annibal. Another brother, Belius (also known as Gene), is referred to later in this opinion.

codefendant told Paul that he "got body shots" and that he (the codefendant) was mad that he did not "get the guy on the bike." The codefendant asked Paul to help him take a nine millimeter gun apart. With a drill, the codefendant attempted to "drill out" the serial numbers on the nine millimeter gun, and picked up a .25 caliber gun, stating that he would "go drill" that gun at home.

After the killing, the defendant warned St. Fort to "[b]e careful" and to "watch [his] back." In his friend Omar Lopez's presence, the defendant said the words "execution style" to Bobby. He also asked Lopez if Lopez had spoken with police, and told Lopez that he did not have to tell them anything, that the police did not need to know anything, and that he (the defendant) believed Alex Knights, another friend of the defendant and a relative of Lopez, was snitching on him.

From the scene of the shooting, police recovered ballistics evidence, including seven .25 caliber discharged cartridge casings, and two spent .25 caliber bullet fragments. Of the seven .25 caliber discharged cartridge casings, five were head stamped "RP" and two were head stamped "CCI." A head stamp is a manufacturer's mark. For example, RP is the mark of the manufacturer Remington Peters.[4] In addition, two nine millimeter discharged cartridge casings, each bearing a foreign head stamp, and one spent nine millimeter bullet fragment were recovered. During an authorized search of the defendant's home on January 18, 1997, police seized a .25 caliber bullet, head stamped RP, from a small blue plastic bag. No weapon or weapons were recovered.

Detective Thomas L. Matthews of the Boston police department, an expert on ballistics evidence, testified that, based on distinct markings that are left by a gun on each casing, his examination of such markings revealed that the seven .25 caliber discharged cartridge casings all came from the same gun, a .25 caliber semiautomatic handgun. He concluded that the other handgun used in the killing was a nine millimeter.

The Commonwealth introduced evidence that the defendant's brother Belius had pleaded guilty to an armed home invasion

[4]The defendant's expert explained that the head stamp "CCI" is the mark of the manufacturer Cascade Cartridge Industries.

and a shooting that occurred on January 23, 1996. Ballistics evidence recovered in that crime included eight discharged cartridge casings and one bullet (no gun was recovered). Over the defendant's objection, Detective Matthews testified that, of those eight discharged cartridge casings, five were fired from one firearm, while three were fired from a different firearm. The five discharged cartridge casings were all .25 caliber cartridge casings that bore the head stamp CCI. Detective Matthews indicated that he had compared the .25 caliber discharged cartridge casings recovered from the January 23, 1996, home invasion with the .25 caliber discharged cartridge casings recovered from the victim's shooting, and concluded that the discharged casings had been fired from the same gun.

The Commonwealth also introduced testimony from a ballistician employed by the Federal Bureau of Alcohol, Tobacco and Firearms, Ronald Dodson. Dodson conducted a manufacturer's mark examination on some of the ballistics evidence recovered from the January 23, 1996, home invasion and from the victim's shooting. He explained that a manufacturer's mark, which is imprinted on a bullet's shell casing, is created by a bunter tool. The bunter tool stamps the manufacturer's mark, such as "RP," or "CCI," onto the head stamp of a cartridge casing and, at the same time, punches a hole. The bunter tool leaves microscopic marks in the letters, and each bunter tool leaves a different mark on each head stamp.

Dodson went on to explain that the Remington Peters bunter tool makes about 40,000 marks in approximately eight hours of production. After eight hours, the bunter tool is changed. The CCI bunter tool makes about 120,000 marks in approximately eight to fifteen hours of production.

Dodson testified that, based on his manufacturer's mark examination, the five .25 caliber discharged cartridge casings head stamped RP, recovered from the scene of the victim's shooting, were all made by the same bunter tool.[5] In addition to these cartridge casings, Dodson indicated that the .25 caliber bullet, head stamped RP, seized from the defendant's home on January 18, 1997, was also made by the same bunter tool. Dod-

---

[5]Dodson also testified, based on a different examination, that these discharged cartridge casings were fired from the same weapon.

son further concluded that the two .25 caliber discharged cartridge casings head stamped CCI, recovered from the scene of the victim's shooting, and the five .25 caliber discharged cartridge casings head stamped CCI, recovered from the January 23, 1996, home invasion, were all stamped by the same bunter tool.

The defendant did not testify. The defense theory was that the defendant did not commit the crime, that St. Fort had the motive to kill the victim, and that the shooting was not the result of a dispute over a bicycle, but rather, a dispute between St. Fort and the victim over "drug dealing territory." Through cross-examination of the Commonwealth's witnesses, the defendant called into question the adequacy of the police investigation, and brought out testimony that the victim had been involved in drug dealing and had been in a dispute with St. Fort, another drug dealer and a witness for the Commonwealth. In presenting his case, the defendant recalled St. Fort to elicit testimony that Paul had admitted to St. Fort that he (Paul) had participated in the shooting of the victim. The defendant also called his own ballistics expert, James T. McGuinness, who testified that a Remington Peters bunter tool makes about 50,000 to 500,000 marks, and that a CCI bunter tool makes several million marks. (This testimony presumably suggested that the Commonwealth's expert had seriously underestimated the number of marks made by the respective bunter tools and, as a consequence, his testimony and opinions were unreliable because the matches he had described were unlikely to have occurred.)

1. The defendant moved before trial to suppress the single .25 caliber bullet found in his home after a search pursuant to a warrant. The search concerned other weapons that the affidavit indicated were kept in the defendant's residence, where he and his brothers were alleged habitually to possess illegal guns and ammunition. The motion was denied in a written memorandum of decision by a judge who was not the trial judge. The defendant argues that the information contained in the affidavit submitted in support of the search warrant was stale (the most recent information being a little less than six weeks old) and that the affidavit was legally insufficient because the veracity

and reliability of one of the informants, Paul, had not been established.[6] We reject these arguments.

First, as noted by the motion judge, the information in the affidavit primarily consists of the firsthand observations of three *named* informants, Paul, St. Fort, and Lopez. Reliability is shown when an informant provides his identity to police and is willing to be named in the affidavit in support of the warrant. See *Commonwealth* v. *Bakoian*, 412 Mass. 295, 301 (1992); *Commonwealth* v. *Atchue*, 393 Mass. 343, 347 (1984). Further, reviewing the affidavit as a whole, it is evident that Paul, in addition to being a named informant for police, provided "firsthand knowledge"; furnished a level of detail and specificity concerning his observations; participated in two recorded interviews with police; and supplied information that, to some extent, was corroborated by police or others. See *Commonwealth* v. *Bakoian, supra*; *Commonwealth* v. *Atchue, supra*, and cases cited. The affidavit sufficiently shows the reliability and credibility of Paul. See *id.* at 347-348, and cases cited.

The motion judge properly rejected the defendant's claim of staleness, relying on correct law and ample support from the four corners of the affidavit. Contrary to the defendant's contention, the weapons sought by the search warrant, "a .38 Smith & Wesson snub-nosed revolver" and "a sawed-off shotgun," were not "inherently incriminating." The weapons had no connection to the victim's shooting, which was made clear in the affidavit by a recital of the ballistics evidence obtained from the shooting, namely that a nine millimeter firearm and .25 caliber firearm had been used to shoot and kill the victim. Additionally, there was no evidence that the weapons sought by the warrant had been used in any other crime, or that the defendant (or any of his brothers, who were also listed as occupying the residence) knew that the weapons had been identified to the police thereby stripping them of their continued utility. See *Commonwealth* v. *James*, 424 Mass. 770, 778 (1997); *Commonwealth* v. *Fleurant*, 2 Mass. App. Ct. 250, 255 (1974). Based on the above, and in circumstances showing continuous illegal presence of a number

[6]Although the jury acquitted the defendant of illegally possessing the single .25 caliber bullet, we address the defendant's arguments because he argues that this physical evidence reinforced Paul's testimony and, thus, was critical.

of weapons in the defendant's residence over extended periods of time, the motion judge could conclude that the time frame for executing the warrant was of less significance. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 343 (1998); *Commonwealth* v. *Vynorius*, 369 Mass. 17, 25 (1975); *Commonwealth* v. *Fleurant*, *supra* at 254-255. The passage of time in this case was not unreasonable.

2. During her opening statement, the prosecutor twice stated that the defendant used a .25 caliber semiautomatic weapon to kill the victim. There was no objection. The defendant now maintains that there was no evidentiary basis for the statements. Because the defendant was found guilty of murder in the first degree on a joint venture theory, the issue of which of the two guns the defendant used was immaterial. See *Commonwealth* v. *Ellis*, 432 Mass. 746, 762 (2000). That being said, the prosecutor could state in her opening statement anything she reasonably, and in good faith, expected to prove with relevant and admissible evidence. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 586 (2003); *Commonwealth* v. *Thomas*, 429 Mass. 146, 157 (1999). In this case, the expected evidence was introduced. There was evidence that the defendant admitted to Paul that he had shot the victim three times in the head. There was ballistics evidence, including discharged cartridge casings, that two guns were used to commit the shooting: a .25 caliber semiautomatic handgun and a nine millimeter handgun. There was also evidence that, later in the morning of the shooting, the defendant was in possession of a .25 caliber semiautomatic handgun, a nine millimeter semiautomatic handgun, and a sawed-off shotgun. There was no impropriety committed by the prosecutor.

3. The defendant asserts that his trial counsel provided him with constitutionally ineffective assistance when he failed to make a hearsay objection to the admission of the guilty pleas of the defendant's brother Belius to an armed home invasion and shooting that occurred on January 23, 1996, and to testimony that Belius had committed those crimes with others. The defendant argues that counsel's inadequacies violated his rights to due process and confrontation.

The issue arose in the following manner. Prior to trial, the defendant moved in limine to exclude evidence of the home

invasion, arguing it was not relevant, was too remote in time, and was not sufficiently "linked" to the defendant. The defendant also argued that the evidence would be highly prejudicial and "would constitute unlawful and improper guilt by association or familial relationship." The trial judge denied the motion.

When the Commonwealth called Detective Paul Martin of the Boston police department to testify concerning the evidence, the defendant asked for a voir dire. The judge denied the request, directing the prosecutor to proceed slowly, indicating that a voir dire might become necessary. Detective Martin testified that he had investigated an incident that occurred on January 23, 1996, and that "[o]ne of the individuals was convicted," naming Belius Beliard and that the investigation led to the recovery of eight empty shell casings.[7] Over the defendant's objection, the Commonwealth attempted to introduce certified copies of Belius's convictions relating to the home invasion. The judge, out of the presence of the jury, told the prosecutor and defense counsel that he had taken Belius's guilty pleas and that his (the judge's) name "was all over the papers." The judge suggested that the papers be excluded, instead permitting the information to be admitted through Detective Martin's testimony. The defendant's counsel, while maintaining his relevancy objection, expressly waived any hearsay objection in order to permit the judge's recommended course of action to proceed. Detective Martin then testified that Belius pleaded guilty to an armed home invasion and a shooting that occurred on January 23, 1996. Immediately thereafter, the judge instructed the jury that the defendants were not involved, or alleged to have been involved, in the armed home invasion and shooting, and the jury were not to infer or conclude otherwise, nor "lay any

[7]The Commonwealth later introduced the testimony of another Boston detective who was also responsible for recovering the ballistics evidence at the January 23, 1996, home invasion. He testified that, of the eight recovered empty shell casings, five were .25 caliber discharged cartridge casings. Detective Matthews testified that the five .25 caliber discharged cartridge casings recovered from the home invasion bore the head stamp CCI. He concluded that, based on his comparison of those casings with the .25 caliber discharged cartridge casings from the shooting, all of the discharged cartridge casings had been fired from the same gun.

responsibility or liability upon [the defendants]" concerning that separate incident.

Apparently recognizing that Detective Martin's testimony, coupled with Detective Matthews's testimony, and testimony from other witnesses, concerning where, and with whom, the defendant resided, was relevant to show that the defendant had access to one of the murder weapons,[8] the defendant has abandoned the relevancy contention and claims, for the first time, that his counsel should have argued instead that Belius's convictions were inadmissible pursuant to *Commonwealth* v. *Tilley*, 327 Mass. 540, 548 (1951), and that a waiver of a hearsay objection amounts to constitutionally ineffective assistance. In the *Tilley* case, the general rule was stated as follows:

> "[I]n a criminal case the record of conviction or acquittal in another case to which the defendant was not a party is not admissible to establish the truth of any fact involved in such conviction or acquittal."

*Id.* The defendant further maintains that, pursuant to *Crawford* v. *Washington*, 541 U.S. 36, 59-60 (2004), the guilty pleas of Belius should be considered unreliable in the absence of Belius's taking the stand.

We conclude that no substantial likelihood of a miscarriage of justice exists. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). The defendant's counsel's decision not to object to the admission of Belius's guilty pleas on hearsay grounds was a tactical decision (expressly stated by means of waiver of a hearsay objection) that cannot be said to have been "manifestly unreasonable." See *Commonwealth* v. *Martin*, 427 Mass. 816,

---

[8] In allowing the testimony, the judge implicitly found that the evidence showed that one of the handguns used in the victim's shooting was the same weapon that had been used in the home invasion, and that, by his guilty plea, the defendant's brother had admitted his involvement in the home invasion, preventing the defendant from claiming that the evidence had no connection to him because others had committed the home invasion. Because the defendant and his brother resided together, the circumstances gave the defendant access to the weapon. Thus, the judge could conclude that the evidence was relevant to link the handgun used in the murder to the defendant and to establish that he was one of the shooters, and that, with the cautionary instruction given to the jury, the probative value of the guilty plea, when placed in context, outweighed the potential prejudice.

822 (1998). Belius was available to testify. Thus, the defendant's counsel could have insisted that Belius, and possibly others, testify to obviate any hearsay issue. Direct testimony from the defendant's own brother and other witnesses would have been far more damaging than Detective Martin's short and direct testimony about the indisputable fact that Belius had pleaded guilty. The strategy followed by defense counsel also avoided the problem of introducing records of the conviction in evidence that would contain the trial judge's name (or compelled redactions that the jury might have impermissibly speculated about) and forced the Commonwealth to prove through other witnesses that Belius was the defendant's brother, and that Belius and the defendant had resided together, facts to which the defendant's trial counsel refused to stipulate.

We reject the defendant's additional contention that Martin's testimony that Belius was one of the individuals involved in the home invasion may have compounded the problem by suggesting that the defendant had also been involved in that incident. The judge's pointed instruction to the jury eliminated that likelihood. The defendant cannot demonstrate prejudice. Finally, Detective Martin's testimony was not the only testimony linking the defendant to a .25 caliber gun. Paul testified that just hours after the shooting, he observed, in the defendant's presence, a .25 caliber gun in the defendant's basement. The entire situation shows that the defendant's trial counsel took a prudent, strategic course of action, after his relevancy objection was (correctly) overruled, to waive a hearsay objection that would have resulted in the defendant's facing live testimony from various witnesses that would do the defendant more harm than good. In the circumstances present here, the *Tilly* and *Crawford* decisions do not prohibit the reasonable tactical strategy followed by defendant's counsel in the crucible of the trial.

4. We reject the defendant's claim of constitutionally ineffective assistance of trial counsel based on counsel, during his direct examination of St. Fort on recall, eliciting hearsay from St. Fort, that Paul had stated to him (St. Fort) that Paul, with the defendant and the defendant's brother, had shot the victim. The defendant contends that, because his trial counsel did not

seek any limitation on the testimony, the statement, although offered for impeachment purposes (Paul had denied making the statement and denied any involvement in the shooting), came in as substantive evidence of his guilt. We conclude that admission of the statement, which was repeated during the codefendant's cross-examination of St. Fort, did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001).

The testimony was not nearly as significant or as damaging as argued by the defendant. Paul had already incriminated the defendant by testifying, on direct examination, that the defendant told him, after the shooting, that he (the defendant) had shot the victim three times in the head, and by testifying that he (Paul) had observed guns, including a nine millimeter and a .25 caliber, in the defendant's possession later in the morning of the shooting. Paul's testimony was consistent with the physical ballistics evidence and with the medical examiner's testimony. With this evidence in mind, the defendant's trial counsel's decision to impeach Paul by eliciting the challenged statement cannot be said to have been a serious failure or manifestly unreasonable. See *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003). The lack of a limiting instruction did not create a substantial likelihood of a miscarriage of justice because the incriminating part of the statement as to the defendant was cumulative of Paul's prior testimony that the defendant told him that he (the defendant) had shot the victim three times in the head.

5. We reject the defendant's contention that he was denied effective assistance of trial counsel when his counsel failed to challenge, pursuant to *Commonwealth* v. *Lanigan*, 419 Mass. 15, 24-27 (1994), the admissibility of the Commonwealth's bunter tool evidence presented by its expert, Ronald Dodson. The defendant argues, with support from a new expert (not the expert called by the defense at trial), a forensic scientist and professor of forensic sciences and law, that Dodson's testimony should have been excluded because the fundamental premise of the bunter tool evidence, that each bunter tool leaves uniquely identifiable markings, has not been scientifically validated.

As an initial matter, the defendant incorrectly maintains that the judge who denied his motion for a new trial on this ground misconstrued his burden under the *Lanigan* case by shifting the burden to him to prove unreliability. The motion judge did not do so, but rather, properly examined the issue in the context of the law governing the defendant's obligations in filing a post-conviction motion for a new trial. The defendant had to establish that his challenge, which could have been properly presented in a motion in limine, would have been successful at that stage of the proceedings. Cf. *Commonwealth* v. *Iglesias*, 426 Mass. 574, 579 (1998).

The motion judge correctly concluded that there has been sufficient acceptance of the evidence by forensic experts, noting that the defendant's expert conceded as much in his affidavit. She also correctly found that the underlying forensic methodology used in bunter tool mark examination is a technique that has long been used to link a bullet to the firearm from which it was fired. See *Commonwealth* v. *Dyer*, 389 Mass. 677, 680 (1983); *Commonwealth* v. *Ellis*, 373 Mass. 1, 3-6 (1977). Close examination of the defendant's argument reveals his pivotal contention, made without any authoritative support, that only forensic *scientists*, and not forensic examiners or other forensic experts, may comprise the "relevant scientific community" which may generally accept proposed scientific evidence. *Commonwealth* v. *Lanigan, supra.* See *Commonwealth* v. *Daye*, 411 Mass. 719, 741 (1992). The motion judge perceived the fallacy in the defendant's argument about unreliability, astutely noting, "What is clear from [the defendant's expert's] affidavit is that he is more qualified to offer a legal argument in opposition to Dodson's testimony than a scientific criticism of the methodology." Notably, the defendant's expert does not state an opinion that the bunter tool markings on the RP and CCI ballistics evidence, respectively, examined by Dodson, were different from each other or not made from the same bunter tool, or that another bunter tool had produced identical or similar markings. For the ample reasons given by the motion judge, the defendant's motion for a new trial was properly denied.

6. After reviewing the record under G. L. c. 278, § 33E, we conclude that the interests of justice do not require a reduction in the murder verdict or a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*