NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-869                                          Appeals Court

              COMMONWEALTH  vs.  CHARLES WILLIAMS.

                        No. 22-P-869.

       Suffolk.     December 5, 2023. – August 1, 2024.

        Present:  Green, C.J., Neyman, & Englander, JJ.


Homicide.  Evidence, Firearm, Videotape.  Firearms.  Search and
     Seizure, Search incident to lawful arrest.  Constitutional
     Law, Search and seizure, Equal protection of laws.
     Practice, Criminal, Motion to suppress, Jury and jurors,
     Challenge to jurors.



     Indictments found and returned in the Superior Court
Department on November 8, 2017.

     A pretrial motion to suppress evidence was heard by
Christine M. Roach, J., and the cases were tried before Janet L.
Sanders, J.

     Richard P. Heartquist for the defendant.
     Erin Knight, Assistant District Attorney, for the
Commonwealth.


     ENGLANDER, J.  The defendant appeals from his conviction by

a jury of murder in the second degree.[1]  His principal argument

_____

     [1] The defendant was also convicted of various firearm
offenses and appeals from those convictions as well.

is that a key piece of evidence -- a firearm used during the commission of the murder -- should have been suppressed pursuant to the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.  The police found the firearm in question on the day they arrested the defendant, over three months after the murder, in a backpack that the defendant had been carrying immediately before he was arrested.  The defendant argues that because the backpack was not on his person at the time of his arrest, and was not seized or searched until after he had been handcuffed and removed from the scene, the seizure and search cannot be justified as a search incident to arrest, or on any other basis that would provide an exception to the warrant requirement.  For the reasons that follow, we conclude that both the seizure and search of the backpack and the seizure of the firearm were lawful under Federal and Massachusetts law.  We discern no merit in the other arguments that the defendant raises, and accordingly affirm the judgments.

Background.  On the evening of July 15, 2017, Dennis Parham was shot and killed at the Lenox Housing Development in the city of Boston.  The shooting was caught by surveillance cameras, and there was at least one eyewitness, who was looking out the window of a nearby home.  Among other things, the surveillance video showed a shooter pulling a gun from his person, firing

several shots, and returning it to his waistband.  In what might be described as a stroke of luck for the investigation, the eyewitness performed independent research on the Internet and, several days after the shooting, identified the defendant to the Boston police as one of what he believed were two shooters whom he had seen on the night of the murder.

More than three months later, on November 5, 2017, Boston police officers went to arrest the defendant after he was located at a home (believed to belong to the defendant's girlfriend) in the Brighton section of Boston.  The police identified the defendant's car in front of the residence and began surveillance.  The police did not obtain any warrants in connection with the planned arrest.  Sometime that morning, the police observed the defendant's car start up, remotely, on the street in front of the defendant's girlfriend's house.  The car was legally parked.  Shortly thereafter, the defendant left the house and walked toward the car.  He had a backpack on his person.  The police allowed him to enter the car, at which point the defendant placed the backpack on the passenger seat.  The police then approached the car from all directions.  One officer approached the driver's side, and asked the defendant to step out.  Another, Officer Patrick Murphy, opened the passenger side door, reached in, and turned off the car engine.  The defendant complied with the officers' order (leaving the backpack in the

car), and was taken to the rear of the car and handcuffed. Shortly thereafter the defendant was placed in a police transport and taken to the police station. Before leaving, the defendant asked the police to leave his car with his girlfriend, who was observing from an adjacent sidewalk.

Officer Murphy called his superior, Sergeant Detective Michael Devane, who was at the police station, to ask him what should be done with the defendant's car. Devane said that he did not want the car impounded. The defendant had been driving a different car on the day of the murder in July, as seen on the surveillance videos. That car had been rented from Zipcar, Inc.; it was not the same car that the police encountered outside the defendant's girlfriend's home in November.

Murphy decided to give the car keys to the girlfriend. Before he did so, however, Murphy learned from another officer that the defendant had been wearing the backpack, now in the car, when the defendant had exited the girlfriend's home. Murphy called Devane a second time, this time asking specifically about the backpack that the defendant had been wearing. Devane told Murphy to bring the backpack to the station. Before Murphy brought the backpack to the station,

however, he opened the backpack and moved around some items inside. He observed the handle of a black handgun.[2]

After the handgun was brought to the station it was examined by police experts. Ballistics from the gun matched several .40 caliber casings recovered from the murder scene and one of the defendant's fingerprints was found on the gun's magazine.

The defendant filed a motion to suppress the gun, along with several other motions to suppress. The essence of the defendant's argument was that the backpack could not be seized or searched without a warrant, and that the search could not be justified as a search incident to arrest because the backpack was not seized or searched until after the defendant had been removed from the scene.

The judge held an evidentiary hearing, and denied the motion as to the backpack and firearm. The judge first concluded that the <u>search</u> of the backpack could not be justified as a search incident to arrest. The judge also concluded, however, that the <u>seizure</u> of the backpack was "reasonable," inasmuch as the backpack had been on the defendant's person immediately prior to his arrest, and was then in the car that

---

[2] The judge's findings from the suppression hearing indicate that this search occurred approximately seven minutes after the defendant had been arrested, and four minutes after the defendant had been removed from the scene.

was going to be turned over to the girlfriend. And although the judge found that Murphy's immediate search of the backpack was not justified, the judge nevertheless held that the gun should not be suppressed, because the lawfully seized backpack would inevitably have been inventoried once it was secured at the station.

The defendant was tried for murder over fourteen days in August and September of 2021. On September 16, 2021, the jury convicted the defendant of murder in the second degree and four additional charges relating to carrying a loaded firearm without a license. This appeal followed.

Discussion. 1. The motion to suppress the gun. The principal issue before us is whether the firearm located in the backpack must be suppressed under the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights. The search of the backpack was conducted without a warrant, and accordingly, the search must be justified under an exception to the warrant requirement. See Commonwealth v. Ortiz, 487 Mass. 602, 606 (2021), quoting Commonwealth v. Arias, 481 Mass. 604, 610 (2019). Here the judge ruled -- and the Commonwealth continues to press on appeal -- that the firearm would have been "inevitably discovered" pursuant to a lawful inventory of the defendant's "possessions," which the Commonwealth contends would have occurred when the backpack was

brought to the police station.  Alternatively, the Commonwealth argues that the search of the backpack was a lawful search incident to arrest, citing in particular Commonwealth v. Figueroa, 468 Mass. 204, 215-216 (2014).

We begin our analysis with "the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'"  Arizona v. Gant, 556 U.S. 332, 338 (2009), quoting Katz v. United States, 389 U.S. 347, 357 (1967).  One of those well-delineated exceptions, however, is the doctrine of search incident to arrest.  In Gant, the United States Supreme Court revisited the permissible scope of a search incident to arrest where, as here, the defendant was seized and arrested immediately after having been in an automobile.  Gant, supra at 338-344.  The Supreme Court clarified that in such circumstances a search of the car (and items in the car) could be justified on either of two grounds:  (1) as reasonably necessary for officer safety, the passenger compartment could be searched if the arrestee was "unsecured and within reaching distance of the passenger compartment at the time of the search," and (2) when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle" (citation omitted).  Id. at 343.

In this case, the warrantless search of the backpack incident to the defendant's arrest was lawful under the second of the above rationales -- it was a lawful search for evidence relevant to the crime.[3]  Gant says that such a search is lawful if it was "reasonable to believe" that relevant evidence "might be found."  Gant, 556 U.S. at 335.  This court has equated the "reasonable to believe" standard with "probable cause," and suggested that Gant's second rationale is merely an application of the well-recognized automobile exception to the warrant requirement.  See Commonwealth v. Starkweather, 79 Mass. App. Ct. 791, 796-797 (2011).[4]  Under the automobile exception, where

---

[3] It bears noting that had the police chosen to arrest the defendant as he walked to the car, the backpack search would have been a lawful search incident to arrest, as the backpack was then on his person.  See Commonwealth v. Phifer, 463 Mass. 790, 795-796 (2012), citing Commonwealth v. Madera, 402 Mass. 156, 159-161 (1988).

[4] There is considerable uncertainty in the case law as to whether Gant's "reasonable to believe" standard equates to probable cause, to reasonable suspicion, or to some other standard that also is less stringent than probable cause.  See United States v. Edwards, 769 F.3d 509, 514 (7th Cir. 2014) ("[t]he Court in Gant did not elaborate on the precise relationship between the 'reasonable to believe' standard and probable cause, but the Court's choice of phrasing suggests that the former may be a less demanding standard"); United States v. Polanco, 634 F.3d 39, 42-43 (1st Cir. 2011) ("the auto exception requires probable cause.  But the Gant evidentiary justification only requires a 'reasonable basis.'  These distinctions make a difference" [citations omitted]); United States vs. Whitlock, U.S. Dist. Ct., No. 2:20-cr-00017 (D. Vt. Apr. 16, 2021) (collecting cases).  We need not decide whether Gant establishes a less stringent standard than probable cause because as set forth below, the facts in this case establish probable cause.

an investigator has probable cause to believe that evidence relevant to a crime is located in an automobile in a public area, the investigator may search those areas of the automobile to which probable cause extends without first obtaining a warrant. See Commonwealth v. Davis, 481 Mass. 210, 220 (2019). The rationale for this exception, also well-established, is primarily exigency -- automobiles are mobile, and the investigator may not have time to get a warrant before the evidence has been moved. See Commonwealth v. Eggleston, 453 Mass. 554, 554 (2009), quoting Commonwealth v. Motta, 424 Mass. 117, 124 (1997). For this reason, the ability to search the vehicle based on probable cause (and without a warrant) "continues even after the arrestee is taken away from the vehicle and is secured." Starkweather, supra at 797.[5] Moreover,

---

[5] The Commonwealth also relies on the officer safety rationale, arguing that the backpack was within the defendant's "lunge area" at the time he was arrested, citing Figueroa, 468 Mass. at 215-216. Gant appears to hold, however, that the scope of a lawful search incident to arrest based on officer safety concerns is judged as of the time of the search. See Gant, 556 U.S. at 343 (rationale for search incident to arrest exception permits "police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" [emphasis added]). Here, the search did not occur until the defendant had been removed from the area, so as of the time of the search the backpack was not within the defendant's reach.

As to the Commonwealth's inevitable discovery argument, the difficulty is a factual one -- the defendant was brought to the police station without the backpack; it was left behind in the

the lawful scope of the search "extends to all containers, open or closed, found within." Commonwealth v. Bostock, 450 Mass. 616, 624 (2008), quoting Commonwealth v. Cast, 407 Mass. 891, 908 (1990).

Here the police investigators had probable cause to believe the backpack the defendant had been carrying on his person might contain evidence relevant to the Parham murder. Probable cause, of course, "is 'not a high bar,'" Commonwealth v. Guastucci, 486 Mass. 22, 26 (2020), quoting District of Columbia v. Wesby, 583 U.S. 48, 57 (2018); it does not require a showing that evidence more likely than not was in the backpack. Probable cause is less than a preponderance; it is a "reasonable likelihood" that evidence will be discovered. Commonwealth v. Murphy, 95 Mass. App. Ct. 504, 509 (2019). And here the information known to the investigators established such a reasonable likelihood.

To begin, it is not disputed that the police had probable cause to arrest the defendant for Parham's murder. There was an eyewitness who identified the defendant as the shooter, based on a fairly detailed description that was reasonably consistent with a surveillance video. As to the location of relevant evidence of the crime, that same surveillance video showed that

---

car. It may be, as the judge ruled, that it was nevertheless reasonable for the police to seize the backpack from the car, so as to reunite it with the defendant as one of his possessions, but for the reasons stated herein, we need not decide.

the defendant had a gun on his person, and returned it to his person after the shooting.  The firearms used in the murder had not been found as of the defendant's arrest.[6]  And, no firearm was found when the defendant was searched at the time of arrest -- it was no longer on his person.

The above facts plainly would have established probable cause to search a backpack the defendant was carrying if, for example, the defendant had been arrested the night of the shooting.  If the murder weapon was not found on the defendant's immediate person at that time, there was of course probable cause to search a container he was carrying (as well as his car, his home, and any other place he might reasonably have left the gun).  See Commonwealth v. Carnes, 81 Mass. App. Ct. 713, 718-719 (2012).  The issue here, however, is whether the investigators' information was too stale to establish probable cause for a search when the investigators finally caught up with the defendant three and one-half months later.

We hold that in the circumstances here, probable cause also existed to search the backpack the defendant was carrying at the time of his arrest.  In evaluating staleness, a key question courts address is whether the item sought is "durable," such that the defendant is still likely to have the item at the time

_____

[6] Ballistics evidence identified shells from two different firearms at the murder scene.

of the search.  The Supreme Judicial Court addressed the

staleness inquiry most recently in Guastucci, 486 Mass. at 23,

in which the court held that where the police had information

that child pornography was located on a computer at a particular

home, that information was not too stale to establish probable

cause to search computers in the home seven months later.

In Guastucci, the court discussed the components of the

"highly fact-intensive" staleness inquiry in depth, beginning

its discussion with general staleness principles that apply in

all cases evaluating probable cause.  Guastucci, 486 Mass. at

26-27.[7]  The question is whether the passage of time has caused

information to lose its significance for determining the

likelihood that evidence will be found, and the issue of "how

long is too long" defies the creation of a bright-line rule.  In

Guastucci, the court identified two principal factors that

should be considered -- (1) "the nature of the criminal

activity," and (2) "the nature of the item to be seized."  Id.

at 27.  In discussing the nature of the criminal activity, the

court was mostly concerned with whether the activity was

ongoing, such that "time is of less significance" (citation

omitted).  Id.  As to the nature of the item being sought, the

_____

[7] While the Guastucci court recognized that the child
pornography context was somewhat unique, the court's discussion
of general principles is nevertheless highly instructive for the
issue before us.

court distinguished between items that are "perishable, readily disposable, or transferrable" -- such as illegal drugs -- and items that are "durable, of enduring use to [their] holder, and not inherently incriminating." Id. at 28. The latter type of item "might reasonably be found in the same location several weeks later." Id. Importantly, the court cited a case involving firearms as an example of the latter, more durable items. Id., citing Commonwealth v. Beliard, 443 Mass. 79, 84-85 (2004) (six week old information concerning firearm was not stale).

Applying the framework and analysis of Guastucci we are satisfied, although the case is a close one, that at the time of the defendant's arrest probable cause existed to search those areas where the defendant might reasonably have secured the gun he used the night of the murder -- including the backpack he was carrying on his person. As to the "nature of the item," firearms are durable and of enduring value to their holder. They are not frequently or easily transferred or discarded. Cf. United States v. Neal, 528 F.3d 1069, 1074 (8th Cir. 2008) ("Information that someone is suspected of possessing firearms illegally is not stale, even several months later, because individuals who possess firearms tend to keep them for long periods of time"). Notably, here there was no evidence the defendant had reason to believe the police were looking for him

in connection with the Parham murder, and thus no urgent reason to dispose of the firearm used on the night of the killing. Cf. Beliard, 443 Mass. at 85 (evidence of weapons' location not stale where no evidence defendant knew weapons had been identified to police). The investigation had unfolded over time, aided by the serendipitous research of an eyewitness not known to the defendant.

Moreover, the police were aware that the defendant had been arrested carrying a firearm at least twice before, in 1998 and 2005. While those arrests were dated, they are not irrelevant to the probable cause calculus; that the defendant was known to carry a firearm adds weight to the inference that the defendant might be carrying the weapon used in the crime when he was located three months after the murder. Put differently, these facts go to the first factor identified in Guastucci -- whether the defendant's criminal activity was ongoing, rather than a single occurrence.[8]

---

[8] The above facts collectively distinguish this case from Commonwealth v. Hart, 95 Mass. App. Ct. 165, 169 (2019), in which we held, on the bare facts there presented, that "a single observation of a firearm in a residence sixty days prior to the application for a search warrant does not establish probable cause that firearms, ammunition, and related materials would be found at that residence." This case does not involve a single observation of a firearm sitting in a residence -- it involves observation of the firearm in use, and returned to the defendant's person. Indeed, in Hart, we emphasized that "[t]here was no assertion that the gun was used to commit a recent armed offense or was linked to any ongoing course of

In short, the touchstone of the Fourth Amendment is reasonableness; here there was a "reasonable likelihood" that the defendant still had the gun he had used, and that the defendant would keep that gun on his person or somewhere it was readily available.  There was probable cause to search those areas when the defendant was arrested on November 5, 2017; a warrant would have been required to search the defendant's home, but no warrant was required to search the backpack located in the car in which he was apprehended.

Finally, our conclusion that there was probable cause to search the defendant's backpack is also consistent with cases from other jurisdictions.  See United States v. Ponzo, 853 F.3d 558, 573 (1st Cir. 2017), cert. denied, 583 U.S. 1115 (2018), quoting United States v. Singer, 943 F.2d 758, 763 (7th Cir. 1991) (four month old information regarding defendant's possession of gun not stale, as "firearms . . . are durable goods useful to their owners for long periods of time"); State v. Marcotte, 123 N.H. 245, 248-249 (1983) (purchase of firearm four months previously sufficient probable cause to obtain warrant to search defendant's home).  The motion to suppress the firearm was properly denied.

---

conduct."  Id. at 168.  Notably, the Supreme Judicial Court in Guastucci also distinguished Hart, as based on "a context-specific inquiry dependent on all the circumstances set forth in the affidavit."  Guastucci, 486 Mass. at 28 n.3.

2.  The Commonwealth's peremptory challenges.  Next, the defendant argues that the Commonwealth's peremptory challenges violated the equal protection clause of the United States Constitution.  The defendant focuses on four challenges in particular -- to jurors nos. 13, 46, 47, and 135.  Although each of these potential jurors were persons of color, the defendant does not claim that the Commonwealth's challenges were inappropriately based on race.  Rather, he complains that the Commonwealth justified its challenges to three of these four jurors based on the young age and inexperience of the potential juror.  The defendant argues that peremptory challenges exercised on the basis of youth can effectively be used to exclude all Black jurors, thereby depriving young Black defendants of a "jury of [their] peers."[9]

---

[9] During empanelment, the Commonwealth exercised peremptory challenges to jurors nos. 13, 46, 47, and 135.  The defendant objected to each challenge based on the Batson-Soares standard for juror selection.  See Batson v. Kentucky, 476 U.S. 79 (1986); Commonwealth v. Soares, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979), overruled in part by Commonwealth v. Sanchez, 485 Mass. 491, 511 (2020).  Juror no. 13 was Hispanic, juror no. 46 was Black, juror no. 47 was Filipino, and juror no. 135 was described as a female "minority."  The Commonwealth justified its challenges to jurors nos. 13, 46, and 135 on the basis of age and inexperience.  The Commonwealth's challenge to juror no. 47 was based on concerns about her impartiality.

As the defendant argues that the Commonwealth's justifications of peremptory challenges based on age deprived him of a jury of his peers, and the Commonwealth did not justify its challenge to juror no. 47 on the basis of age, the defendant's argument is inapplicable to juror no. 47.

The defendant's argument is foreclosed by established case law. His argument amounts to an assertion that, because peremptory challenges based on the age of the potential juror may result in the exclusion of members of minority groups, those peremptory challenges are unconstitutional. However, it is well-established, both in this Commonwealth and under Federal law, that "age is not a discrete grouping defined in the Constitution, and therefore a peremptory challenge may permissibly be based on age." Commonwealth v. Oberle, 476 Mass. 539, 545 (2017). See Commonwealth v. Grier, 490 Mass. 455, 462-463 (2022); Commonwealth v. Fernandes, 487 Mass. 770, 775-776 (2021), cert. denied, 142 S. Ct. 831 (2022); Commonwealth v. Lopes, 478 Mass. 593, 597 (2018); United States v. Cresta, 825 F.2d 538, 545 (1st Cir. 1987), cert. denied, 486 U.S. 1042 (1988) ("young adults" not "cognizable group" under equal protection clause). Furthermore, there is no evidence in the record to suggest that the Commonwealth engaged in a pattern of discrimination against protected groups in its exercise of peremptory challenges. Indeed, as of the second day of jury selection, six Black jurors had already been seated. We discern no impropriety in the Commonwealth's justification of its peremptory challenges based on the young age of jurors nos. 13, 46, and 135.

3.  Use of surveillance footage during eyewitness testimony.  Finally, the defendant argues that the judge committed prejudicial error by allowing the Commonwealth to show video surveillance footage to the eyewitness during his testimony, because (allegedly) the process amounted to leading the witness and causing him to alter and to improve upon his testimony.  Upon review of the record, we find that there is no basis on which to conclude that prejudicial error occurred.

A trial judge "has broad discretion in making evidentiary rulings" (citation omitted).  Commonwealth v. Martinez, 476 Mass. 186, 190 (2017).  "We review a judge's evidentiary rulings for an abuse of discretion."  Commonwealth v. Welch, 487 Mass. 425, 440 (2021), quoting Commonwealth v. Andre, 484 Mass. 403, 414 (2020).  When an objection is preserved at trial, as here, we review for prejudicial error.  See Commonwealth v. Reyes, 483 Mass. 65, 78 (2019), citing Commonwealth v. Vargas, 475 Mass. 338, 348 (2016).  An error is prejudicial if it raises a "reasonable possibility that the error might have contributed to the jury's verdict."  Commonwealth v. Alphas, 430 Mass. 8, 23 (1999) (Greaney, J., concurring).

Here, the prosecution played several brief clips of surveillance videos of the scene during direct examination of the eyewitness.  The video playback was paused on several occasions.  The witness provided testimony during intervals

between video clips. During the first interval, after a clip of one video recording had played for roughly thirty seconds, the witness provided certain details regarding his movements before the shooting, and recounted hearing gunshots and seeing people running outside his window. He referred to a map of the area and identified and located his lines of sight. He described one of the individuals he observed at the scene (the victim) as wearing a baseball cap and red sneakers. The prosecution then played approximately thirty additional seconds of video footage, after which the witness described one of the shooters as a tall and "husky" Black man, who was wearing a black baseball hat, white T-shirt, and shorts.

While the witness provided further details of his observations after the prosecution played the additional thirty seconds of video footage, we are not persuaded that the examination constituted impermissible leading. The witness's testimony, as a whole, sufficiently demonstrated that he had personal knowledge of the events to which he testified, as he observed them from his window. The defendant would have us conclude that the witness's testimony provided during the intervals between video clips was led by the video footage that he had been shown, but on the record before us, which includes the relevant video clips, we are not persuaded that the witness was impermissibly led by the clips rather than testifying from

his own memory.  Furthermore, any variances from the witness's prior testimony or his prior statements could of course be explored through cross-examination.  See Commonwealth v. Pina, 481 Mass. 413, 429 (2019), citing Mass. G. Evid. § 701 (2018) ("[a] lay witness is permitted to identify an individual depicted in a video or photograph if that testimony would assist the jurors in making their own independent identification").

Judgments affirmed.